[No. 23653-2-II.    Division Two.    September 17, 1999.]
NORBERT CHARLES EELBODE, ET AL., *Appellants*, v. CHEC
MEDICAL CENTERS, INC., ET AL., *Respondents*.

*John Andrew Hoglund* of *Law Office of John A. Hoglund,* for appellants.

*Aaron Dean, Rebecca Sue Ringer,* and *Karen Adell Kalzer* of *Lee, Smart, Cook, Martin & Patterson, P.S., Inc.,* for respondents.

ARMSTRONG, A.C.J. — Norbert Eelbode appeals a summary judgment dismissing his medical malpractice complaint against a physical therapist who conducted a pre-employment physical. In granting summary judgment, the trial court ruled that there was no physician-patient relationship between Eelbode and the therapist, and, alternatively, Eelbode, by signing a waiver, assumed the risk of injury in the lifting test given during the physical. Additionally, Chec Medical Centers contends that Eelbode failed to set forth by affidavit sufficient facts to support his claim of medical malpractice. We hold that, although marginal, Eelbode's documents in opposition to summary judgment did create issues of fact; that Chec's physical therapist owed a duty not to harm Eelbode during the physical although no physician-patient relationship existed; and that the waiver does not bar Eelbode's claim. Accordingly, we reverse and remand.

## FACTS

Norbert Eelbode applied for a job with Travelers Inn. Pursuant to his application, Eelbode was sent to Laura Grothe, a physical therapist at Chec Medical Centers (Chec), for a preemployment physical examination. Before the examination, Eelbode signed a document that provided in part:

The pre-placement physical is physically demanding and

requires the lifting of heavy objects. The lifting can result in muscle strain and possible back discomfort or more serious injuries in persons who do not have adequate strength or who have a pre-existing back or other health problems.

. . . .

. . . . To the fullest extent permitted by law, I hereby release Chec and the Washington Readicare Medical Group and its physicians from all liability arising from any injury to me resulting from my participation in the exam including, but not limited to, any injury resulting from my failure to provide information concerning my physical or mental condition or to refrain from participating in an activity as required by this acknowledgement and agreement.

Claiming that he was injured because of an improperly administered back torso strength test, Eelbode sued Grothe and Chec for medical malpractice. Specifically, Eelbode claimed that Grothe "required" him to lift "while bending from the waist using only his back with his knees locked." Eelbode alleged that as a result he "experienced immediate sharp and burning pain in his low back, right gluteal area, and down the back of his right leg to the middle of his calf."

The trial court granted the defendants' summary judgment motion, noting the "extensive nature of the waiver." Eelbode appeals.

## ANALYSIS
### A. Standards for Review

■■ In reviewing a summary judgment, we engage in the same inquiry as the trial court. *Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982) (citation omitted); *Seven Gables Corp. v. MGM/UA Entertainment Co.*, 106 Wn.2d 1, 12-13, 721 P.2d 1 (1986). A summary judgment can be granted only if the pleadings, affidavits, depositions, and admissions on file demonstrate the absence of any genuine issues of material fact, and that the moving party is entitled to judgment as a matter of law. *Wilson*, 98 Wn.2d

at 437 (citation omitted). We construe all facts and reasonable inferences in favor of the nonmoving party. *Id.* at 437 (citations omitted). And we review de novo statutory interpretations as a question of law. *In re Post Sentencing Review of Charles*, 135 Wn.2d 239, 245, 955 P.2d 798 (1998) (citations omitted).

### B. Did Eelbode allege sufficient facts to support the elements of a medical malpractice negligence action?

In opposition to Chec's motion for summary judgment, Eelbode submitted affidavits from two physical therapists and a chiropractor. In opining that Grothe negligently administered the back test, each relied upon how the incident had been "described," or a review of Grothe's records of the examination, or both. But Eelbode did not submit an affidavit describing firsthand how the incident occurred. This failure forms the basis of Chec's argument that Eelbode has not set forth an adequate factual record of his claim. Specifically, Chec argues that Eelbode did not describe by affidavit how the test was administered or that he was injured as a result. Thus, according to Chec, Eelbode has not connected his experts' opinions that the test was negligently administered with the actual test he was given. We disagree.

In addition to affidavits from his own experts, Eelbode submitted an affidavit from Grothe. In it, she identified Chec's records of her examination of Eelbode. She also described the back test as "having the test subject lift using the back only, with legs locked, pulling up on a chain attached to a scale . . . ." Further, she reported that although she could not "recall the specific events relating to Mr. Eelbode's alleged injury, it is clear to me that Mr. Eelbode expressed discomfort to me following the back torso strength test . . . ." And Eelbode's experts stated in their affidavits that Grothe's description of the test was not the proper and accepted method of administering it.

Construing the facts and all reasonable inferences in

favor of Eelbode, this is sufficient to create a factual issue of whether Grothe negligently administered the back strength test.

## C. Requirement of Physician-Patient Relationship

Chec contends that Eelbode was not Grothe's patient and that a physician-patient relationship is required to subject a health-care practitioner to liability under Washington's comprehensive medical malpractice act.[1] Essentially, Chec argues that Grothe and Chec had no duty not to harm Eelbode.[2] We disagree.

▮▮ The medical malpractice act sets forth three causes of action: (1) failure to follow the accepted standard of care; (2) failure to obtain informed consent; and (3) a promise that the injury would not occur. RCW 7.70.030. A cause of action for informed consent or a promise not to injure requires that the injured person be a patient. RCW 7.70.030(2), (3). But a claim of failure to follow the accepted standard of care does not require a physician-patient relationship. RCW 7.70.030(1).

Moreover, the statute imposes liability for failure to follow the accepted standard of care upon any "health care provider." RCW 7.70.030(1). Although physical therapists are included in the statutory definition of "health care provider," so are opticians, pharmacists, and paramedics. RCW 7.70.020(1). Yet under most circumstances, the latter three professionals do not establish physician-patient relationships with the persons they serve. *Daly v. United States*, 946 F.2d 1467, 1469 (9th Cir. 1991). Including these professionals as health care providers under the statute supports a legislative intent "to impose liability beyond the context of a physician-patient relationship." *Id.* at 1469.

---

[1]*See* RCW 7.70 (LAWS OF 1975-76, 2d Ex. Sess., ch. 56, §§ 6-13).

[2]The elements of negligence, including negligence under the medical malpractice statute, are duty, breach, causation, and harm (damages). *Pedroza v. Bryant*, 101 Wn.2d 226, 228, 677 P.2d 166 (1984) (citation omitted).

In *Daly* the Ninth Circuit considered whether Washington law requires a physician-patient relationship in a claim for failure to follow the accepted standard of care. There, a doctor gave a preemployment physical. The question was whether, in the absence of a physician-patient relationship, he had a duty to inform the person examined of abnormal test results. In holding that he did, the court relied upon *McKee v. American Home Products Corp.*, 113 Wn.2d 701, 782 P.2d 1045 (1989) (pharmacist had a duty to warn of known or obvious errors in a prescription), and *Harbeson v. Parke-Davis, Inc.*, 98 Wn.2d 460, 656 P.2d 483 (1983) (recognizing a cause of action for wrongful life without first finding a doctor-patient relationship between the physician and the unborn child). We agree with *Daly*'s reasoning.

Further, we are persuaded by the nature of Eelbode's claim that no physician-patient relationship is required. Eelbode does not argue that Grothe is liable for failing to properly diagnose or treat, obligations that inhere in the physician-patient relationship. Rather, Eelbode claims only that Grothe undertook to administer a specific test and did so negligently, causing him harm. We hold that in this restricted circumstance, Grothe owed Eelbode a duty to administer the test according to accepted standards. And the facts of the case do not require that we set the outer limits of the duty owed by Grothe, or any physical therapist, in giving preemployment physical examinations. Because we find a duty to follow accepted standards exists, we need not address Chec's argument that Eelbode must prove gross negligence.[3]

Finally, the weight of authority from other jurisdictions supports our conclusion that no physician-patient relation-

---

[3]Gross negligence has been defined as "negligence substantially and appreciably greater than ordinary negligence. Its correlative, failure to exercise slight care, means not the total absence of care but care substantially or appreciably less than the quantum of care inherent in ordinary negligence." *Nist v. Tudor*, 67 Wn.2d 322, 331, 407 P.2d 798 (1965).

ship is needed to create liability for a claimed failure to follow the accepted standard of care.[4]

## D. Validity of the Release

Chec maintains that when Eelbode signed the release, he either (1) released Chec in advance from any liability for harm occurring during the exam, or (2) expressly assumed the risk of a back injury occurring during the examination.

### 1. Did the release cover negligence on the part of Chec employees?

The release signed by Eelbode states, in part:

> To the fullest extent permitted by law, I hereby release Chec and the Washington Readicare Medical Group and its physicians from all liability *arising from any injury to me resulting from my participation in the exam* including, but not limited to, any injury resulting from my failure to provide information concerning my physical or mental condition or to refrain from participating in an activity as required by this acknowledgement and agreement.

(Emphasis added.) The emphasized language is very broad. It purports to release Chec for "all liability arising from any injury to me resulting from my participation in the exam." And Grothe's alleged negligence in directing Eelbode to lift a weight occurred during Eelbode's participation in the exam.

■ Exculpatory language in a preinjury release must be clearly stated. *Vodopest v. MacGregor*, 128 Wn.2d 840, 848, 913 P.2d 779 (1996) (citing *Scott v. Pacific W. Mountain Resort*, 119 Wn.2d 484, 490, 834 P.2d 6 (1992)). The language in Chec's release is broad enough to cover even

---

[4]*Green v. Walker*, 910 F.2d 291, 295-96 (5th Cir. 1990); *Keene v. Wiggins*, 69 Cal. App. 3d 308, 313, 138 Cal. Rptr. 3, 7 (1977); *Greenberg v. Perkins*, 845 P.2d 530, 535-36 (Colo. 1993); *Ranier v. Frieman*, 294 N.J. Super. 182, 682 A.2d 1220, 1224 (1996); *Beadling v. Sirotta*, 41 N.J. 555, 561, 197 A.2d 857, 860-61 (1964); *Cleghorn v. Hess*, 109 Nev. 544, 548-49, 853 P.2d 1260 (1993); *Baer v. Regents of Univ. of Cal.*, 118 N.M. 685, 688-90, 884 P.2d 841 (1994); *Rand v. Miller*, 185 W. Va. 705, 707, 408 S.E.2d 655 (1991).

negligence on the part of Chec's staff. Nonetheless, such broadly phrased exculpatory clauses are enforceable unless "(1) they violate public policy, or (2) the negligent act falls greatly below the standard established by law for protection of others, or (3) they are inconspicuous." *Vodopest*, 128 Wn.2d at 848 (citing *Scott*, 119 Wn.2d at 492). Eelbode does not claim that Grothe's negligence falls greatly below a standard established by law, or that the clause was inconspicuous. Therefore the clause is enforceable unless it violates public policy. *See, e.g., Scott*, 119 Wn.2d at 490-91.

2. Was the exculpatory clause void because it violated public policy?

■ In *Wagenblast v. Odessa School District No. 105-157-166J*, 110 Wn.2d 845, 758 P.2d 968, 85 A.L.R.4TH 331 (1988), the Washington State Supreme Court adopted six factors to guide courts in deciding whether a preinjury exculpatory agreement violates public policy:

(1) the transaction concerns a business of a type generally thought suitable for public regulation; (2) the party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public; (3) the party holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards; (4) as a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services; (5) in exercising a superior bargaining power, the party confronts the public with a standardized adhesion contract of exculpation and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence; (6) as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents.

*Vodopest*, 128 Wn.2d at 854-55 (citing *Wagenblast*, 110 Wn.2d at 851-52 (citing *Tunkl v. Regents of Univ. of Cal.*,

60 Cal. 2d 92, 98-101, 383 P.2d 441, 32 Cal. Rptr. 33, 6 A.L.R.3D 693 (1963))). The more *Wagenblast* characteristics that appear in an exculpatory agreement, the more likely the agreement will be found to violate public policy. *Wagenblast*, 110 Wn.2d at 852.

The *Wagenblast* factors favor a finding that the exculpatory language of the release violates public policy. Physical therapy services and health care services are regulated by the state. *See* RCW 18.74; RCW 18.100. Physical therapists must be licensed with the secretary of health and must conform to standards regarding the appropriateness of physical therapy. RCW 18.74.090; RCW 18.74.025. Furthermore, at least one court has recognized the public importance of preemployment physicals: "We live in an age in which the drive for an increasingly productive workforce has led employers increasingly to require that employees subject their bodies (and minds) to inspection in order to obtain or maintain employment." *Green v. Walker*, 910 F.2d 291, 295 (5th Cir. 1990) (citation omitted) (holding that when a preemployment physical is conducted as a condition of employment, the examination creates a relationship between the examining physician and the examinee and the physician has a duty to conduct the tests with due care). And Chec holds itself out as willing to perform a preemployment physical for any party who seeks it.[5]

Chec also had a "decisive advantage" in bargaining strength and used it to form an adhesion contract. Eelbode was required to take the physical pursuant to his employment application. He was sent to Chec and was required to sign the waiver to get the examination. Courts have long recognized that the disparity of bargaining power between employer and employee may force the employee to accept what is otherwise an untenable agreement. *Wagenblast*, 110 Wn.2d at 850. And the agreement Eelbode signed had

[5]There is no evidence in the record that Chec offers its services only on a select basis.

all the characteristics of an adhesion contract.[6] It was a standard printed contract, prepared by Chec and submitted to Eelbode with no opportunity to negotiate a more favorable agreement. Finally, as a result of the adhesion contract, Eelbode was placed completely under the control of Chec personnel during the exam, subject to the risk of carelessness by Chec's physical therapist.

We hold that Chec's release, tested against the *Wagenblast* factors, violates public policy and is, accordingly, void.[7] Because the release is invalid as against public policy, it is also invalid as an express assumption of risk. *Wagenblast*, 110 Wn.2d at 856-57.

Reversed and remanded.

HOUGHTON and HUNT, JJ., concur.

[6]*Yakima County (W. Valley) Fire Protection Dist. No. 12 v. City of Yakima*, 122 Wn.2d 371, 393, 858 P.2d 245 (1993) (quoting *Standard Oil Co. v. Perkins*, 347 F.2d 379, 383 n.5 (9th Cir. 1965)) states:

The factors considered in determining whether a contract is an adhesion contract are (1) whether the contract is a standard form printed contract, (2) whether it was "prepared by one party and submitted to the other on a 'take it or leave it' basis," and (3) whether there was "no true equality of bargaining power" between the parties.

[7]Cases from other jurisdictions support our conclusion. In *Belshaw v. Feinstein*, 258 Cal. App. 2d 711, 65 Cal. Rptr. 788 (1968), the California Court of Appeals applied the *Tunkl/Wagenblast* factors to invalidate a preinjury release for the negligence of two neurosurgeons in performing an operation. In *Meiman v. Rehabilitation Ctr., Inc.*, 444 S.W.2d 78 (Ky. 1969), the Kentucky Court of Appeals applied the *Tunkl/Wagenblast* factors to invalidate a preinjury release for the negligence of a physical therapist whose conduct resulted in a broken hip. In *Olson v. Molzen*, 558 S.W.2d 429 (Tenn. 1977), the Supreme Court of Tennessee applied the *Tunkl/Wagenblast* factors to invalidate a preinjury release for the negligence of an osteopath who improperly performed an abortion.