# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| DENISE REAGAN, | No. 50662-9-II |
| Appellant, | |
| v. | PUBLISHED OPINION |
| ST. ELMO NEWTON, III, M.D., | |
| Respondent. | |

MAXA, C.J. – Denise Reagan appeals the trial court's dismissal on summary judgment of a medical malpractice lawsuit she filed against Dr. St. Elmo Newton. Reagan alleges that Dr. Newton injured her while conducting an independent medical examination (IME) on her. The trial court granted summary judgment in favor of Dr. Newton because Reagan did not present expert testimony that Dr. Newton violated the standard of care as required to maintain a medical malpractice action under chapter 7.70 RCW. The court also disregarded without comment Reagan's medical battery claim that she had not pleaded but had raised in opposition to summary judgment.

RCW 7.70.010 states that the substantive and procedural requirements of chapter 7.70 RCW, the medical malpractice statute, apply to actions regarding injuries "occurring as a result of health care." RCW 7.70.030, which establishes the grounds for a medical malpractice claim, also applies to injuries "occurring as the result of health care." The primary question here is whether a physical examination during an IME that causes injury to the person being examined

constitutes "health care" governed by chapter 7.70 RCW. In addition, a question exists whether a person injured during an IME also can maintain a common law medical battery claim against the IME physician.

We hold that (1) a physical examination during an IME that causes injury to the person being examined constitutes "health care" under RCW 7.70.010 and therefore Reagan was required to present expert testimony regarding breach of the standard of care, (2) the trial court properly dismissed Reagan's medical malpractice claim against Dr. Newton because she did not present expert testimony addressing the applicable standard of care or whether Dr. Newton had breached that standard of care, and (3) Reagan can maintain a claim for medical battery under CR 15(b) even though she did not plead that claim and Reagan presented evidence in opposition to summary judgment that created a genuine issue of material fact regarding Dr. Newton's liability for medical battery.

Accordingly, we affirm the trial court's dismissal of Reagan's medical malpractice claim, but we reverse the trial court's dismissal of Reagan's medical battery claim and remand for further proceedings.

## FACTS

In June 2013, Reagan injured her back while in the course of her employment. She filed a workers' compensation claim with the Department of Labor and Industries (DLI). DLI accepted Reagan's claim for injuries to her thoracic and cervical regions.

DLI subsequently requested that Reagan undergo an IME. The IME's purpose was to determine Reagan's current work restrictions, if she could return to work, if her treatment had concluded, and whether she had a permanent impairment as a result of the injury. DLI also requested that the IME provider make treatment recommendations, including stating whether

treatment was curative or rehabilitative, the goals of treatment, and the estimated length and prognosis of treatment.

In May 2014, Dr. Newton, an orthopedic physician, and Dr. Dennis Chong, a physiatrist, performed Reagan's IME. Reagan's sister-in-law, Lisa Wilson, accompanied her to the examination and remained in the room throughout the exam.

Reagan told Dr. Newton that she had a previous injury to her left hip. During his physical examination, Dr. Newton had Reagan lie on her back. He then bent her left knee toward her chest and rotated her bent knee from the hip joint. Reagan told Dr. Newton that her hip would not rotate any further because of her previous injury, but Dr. Newton pushed her leg all the way down. Reagan screamed in pain, and Dr. Newton stated, "That was the reaction I was looking for." Clerk's Papers (CP) at 110. Wilson also recalls Reagan telling Dr. Newton "that's as far as it goes" before he "yanked" on her leg, Regan crying out in pain, and Dr. Newton commenting about Reagan's reaction. CP at 113-114. As a result of this maneuver, Reagan experienced excruciating pain in her hip. Wilson, who drove Reagan home, stated that Reagan continued to experience pain and discomfort after the IME concluded.

Reagan subsequently filed a lawsuit against Dr. Newton in which she alleged that his negligence in manipulating her hip during the IME caused her injury. The complaint requested a judgment against Dr. Newton for damages suffered as a result of his negligence. The complaint did not assert a claim for medical battery.

Dr. Newton moved for summary judgment on liability. Specifically, he claimed that Reagan had failed to present expert testimony required to support a claim under RCW 7.70.030(1) that he had breached the appropriate standard of care during his examination of Reagan.

3

Reagan opposed the summary judgment motion, claiming that chapter 7.70 RCW did not apply to her claim because Dr. Newton was not providing "heath care" during the IME. She also asserted in her brief that she could recover under a theory of medical battery.

Reagan submitted declarations from Dr. Bruce Blackstone, who saw her for a subsequent IME in January 2015, and from Dr. Mark Colville, who performed her original hip surgery. Dr. Blackstone characterized Reagan's "acute onset of left hip pain that occurred during the IME of May 13, 2014" as "an aggravation of pre-existing arthritis, which is actually attributable to her work-related injury suffered back in 2008." CP at 127-28. Dr. Colville also attributed the left hip pain to "the manipulation performed during her independent medical exam [of May 2014]," finding that it had "aggravated a preexisting osteoarthritic condition of the left hip." CP at 142. But neither physician offered any opinion regarding the appropriate standard of care or whether Dr. Newton followed that standard of care during the IME.

Dr. Newton's reply brief did not mention medical battery. But the parties addressed the claim on the merits during oral argument, and Dr. Newton did not argue that the trial court should not consider the medical battery claim because it had not been pleaded. The court did not address medical battery during argument or in its summary judgment order.

The trial court granted summary judgment in favor of Dr. Newton and dismissed Reagan's claims. Reagan appeals the trial court's summary judgment order.

ANALYSIS

A.     SUMMARY JUDGMENT STANDARD

Our review of a dismissal on summary judgment is de novo. *Frausto v. Yakima HMA, LLC*, 188 Wn.2d 227, 231, 393 P.3d 776 (2017). We review all evidence and reasonable inferences in the light most favorable to the nonmoving party. *Keck v. Collins*, 184 Wn.2d 358,

368, 357 P.3d 1080 (2015).  We may affirm an order granting summary judgment if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Id.* at 370; CR 56(c).  A genuine issue of material fact exists if reasonable minds could disagree on the facts controlling the outcome of the case.  *Sutton v. Tacoma Sch. Dist. No. 10*, 180 Wn. App. 859, 864-65, 324 P.3d 763 (2014).

The party moving for summary judgment has the initial burden to show there is no genuine issue of material fact.  *Zonnebloem, LLC v. Blue Bay Holdings, LLC*, 200 Wn. App. 178, 183, 401 P.3d 468 (2017).  A moving defendant can meet this burden by showing that there is an absence of evidence to support the plaintiff's claim.  *Id.*  Once the defendant has made such a showing, the burden shifts to the plaintiff to present specific facts that show a genuine issue of material fact.  *Id.*  Summary judgment is appropriate if a plaintiff fails to show sufficient evidence to establish the existence of an essential element on which he or she will have the burden of proof at trial.  *Lake Chelan Shores Homeowners Ass'n v. St. Paul Fire & Marine Ins. Co.*, 176 Wn. App. 168, 179, 313 P.3d 408 (2013).

B.  APPLICABILITY OF MEDICAL MALPRACTICE STATUTE

Reagan argues that the medical malpractice statute, chapter 7.70 RCW, does not apply here because an IME does not involve "health care."  We disagree.

1.  Legal Background

Chapter 7.70 RCW modified "certain substantive and procedural aspects of all civil actions and causes of action, whether based on tort, contract, or otherwise, for damages for injury occurring *as a result of health care*."  RCW 7.70.010 (emphasis added).  Chapter 7.70 RCW exclusively governs any action for damages based on an injury resulting from health care.  *Fast v. Kennewick Pub. Hosp. Dist.*, 187 Wn.2d 27, 34, 384 P.3d 232 (2016).

Chapter 7.70 RCW does not define the phrase "health care." *Beggs v. Dept. of Soc. & Health Servs.*, 171 Wn.2d 69, 79, 247 P.3d 421 (2011). RCW 7.70.020 defines "health care provider" to include not only physicians but also a wide variety of persons "licensed by this state to provide health care or related services." RCW 7.70.020(1).

To recover damages for "injury occurring *as the result of health care*," a plaintiff must establish at least one of three propositions:

> (1) That injury resulted from the failure of a health care provider to follow the accepted standard of care;
> (2) That a health care provider promised the patient or his or her representative that the injury suffered would not occur;
> (3) That injury resulted from health care to which the patient or his or her representative did not consent.

RCW 7.70.030 (emphasis added).

For a damages claim based on a health care provider's failure to follow the accepted standard of care under RCW 7.70.030(1), a plaintiff must prove both that the health care provider "failed to exercise that degree of care, skill, and learning expected of a reasonably prudent health care provider" and that such failure was a proximate cause of the plaintiff's injuries. RCW 7.70.040(1).

In a medical malpractice action, the applicable standard of care generally must be established by expert testimony. *Reyes v. Yakima Health Dist.*, 191 Wn.2d 79, 86, 419 P.3d 819 (2018). The expert testimony must establish what a reasonable medical provider would or would not have done under the circumstances, that the defendant failed to act in that manner, and that this failure caused the plaintiff's injuries. *Keck*, 184 Wn.2d at 371. If the plaintiff lacks expert testimony regarding one of the required elements, the defendant is entitled to summary judgment on liability. *Reyes*, 191 Wn.2d at 86.

2.    IME as "Health Care"

The provisions of the medical malpractice statute apply only to injuries occurring as the result of "health care." RCW 7.70.010; RCW 7.70.030. The question here is whether a physician's physical examination during an IME that causes injury to the person being examined constitutes "health care."

a.    Definition of "Health Care"

As noted above, chapter 7.70 RCW does not define the term "health care." *Beggs*, 171 Wn.2d at 79. Normally, we would engage in a statutory interpretation analysis to determine and give effect to the legislature's intent. *See Gray v. Suttell & Assocs.*, 181 Wn.2d 329, 339, 334 P.3d 14 (2014). However, the Supreme Court and several Court of Appeals decisions have adopted the following definition of "health care" for purposes of the medical malpractice statute: " '[T]he process in which [the physician] was utilizing the skills which he had been taught in examining, diagnosing, treating or caring for the plaintiff as his patient.' " *Beggs*, 171 Wn.2d at 79 (second alteration in original) (quoting *Estate of Sly v. Linville*, 75 Wn. App. 431, 439, 878 P.2d 1241 (1994)); *see also Berger v. Sonneland*, 144 Wn.2d 91, 109, 26 P.3d 257 (2001); *Branom v. State*, 94 Wn. App. 964, 969-70, 974 P.2d 335 (1999).

This definition is consistent with one dictionary's definition of "health care" as " '[t]he prevention, treatment, management of illness and the preservation of mental and physical well-being through the services offered by the medical and allied health professions.' " *Berger*, 144 Wn.2d at 109 (alteration in original) (quoting THE AMERICAN HERITAGE DICTIONARY 833 (3d ed. 1992)); *see also Beggs*, 171 Wn.2d at 79 (stating that the definition of "health care" the court adopted is consistent with "a common dictionary definition").

Courts have interpreted "injuries resulting from health care" under RCW 7.70.010 to encompass scenarios not involving traditional patient care. *Berger*, 144 Wn.2d at 110 (a physician's unauthorized disclosure of confidential patient information to the patient's ex-husband); *Branom*, 94 Wn. App. at 970-71 (financial and emotional distress injuries to parents arising from a physician's alleged failure to inform them of their infant's medical condition even though the physician did not treat the parents).

On the other hand, courts have declined to hold that other types of claims against physicians involved "injuries resulting from health care." *Young v. Savidge*, 155 Wn. App. 806, 821-23, 230 P.3d 222 (2010) (dentist's intentional misrepresentation regarding the composition of a crown he installed); *Estate of Sly*, 75 Wn. App. at 440 (physician's misrepresentation to a patient regarding his opinion of the quality of the care the patient had previously received from the physician's colleague).

### b.    Examining and Diagnosing

The first part of the definition of "health care" requires that the physician utilize his or her learned skills regarding examination, diagnosis, treatment, or care. *Beggs*, 171 Wn.2d at 79. Here, Dr. Newton was utilizing his medical skills to examine Reagan. His alleged negligence occurred during his physical examination of Reagan's hip. A physician's physical examination, even during an IME, falls squarely within the first part of the "health care" definition.

Reagan argues that an IME does not meet the definition of "health care" because an IME physician does not provide treatment or any services to the person undergoing the IME. Instead, the physician performs the IME on behalf of and for the benefit of DLI. Reagan points out that the interests of the worker and the IME examiner often are adversarial because the physician's duty is to DLI, not to the worker. However, providing treatment and patient care are only two of

the disjunctive aspects of "health care." Dr. Newton was engaged in another aspect – examination.

Reagan also argues that the medical malpractice statute is in derogation of the common law and must be construed narrowly, citing *Sherman v. Kissinger*, 146 Wn. App. 855, 865-66, 195 P.3d 539 (2008). But as noted above, we do not need to engage in statutory construction because the Supreme Court has adopted a definition of "health care." *Beggs*, 171 Wn.2d at 79.

We conclude that Dr. Newton's physical examination of Reagan during the IME satisfied the first part of the definition of "health care" under the medical malpractice statute.

### c. Physician-Patient Relationship

The second part of the definition of "health care" requires that the physician's skillful services be provided to the plaintiff "as [the physician's] patient." *Beggs*, 171 Wn.2d at 79. Based on this language, Reagan argues that physician's conduct constitutes "health care" only if the person injured was the physician's patient. Because the parties acknowledge that Dr. Newton and Reagan had no traditional physician-patient relationship, Reagan claims that the medical malpractice statute is inapplicable to injuries occurring during the IME.

Reagan's interpretation of the phrase "as the [physician's] patient" in the definition of "health care" as requiring a "full" physician-patient relationship is inconsistent with case law applying RCW 7.70.030(1) to situations not involving such a relationship.

In *Eelbode v. Chec Medical Centers, Inc.*, the plaintiff filed a medical malpractice action against a physical therapist who allegedly injured him while conducting a pre-employment physical. 97 Wn. App. 462, 464-65, 984 P.2d 436 (1999). The defendant argued that a physician-patient relationship was required to subject a health-care practitioner to liability under the medical malpractice statute. *Id.* at 467. This court disagreed, holding that a claim of failure

9

to follow the accepted standard of care under RCW 7.70.030(1) does not require a physician-patient relationship. *Id.* The court noted that the weight of authority in other jurisdictions supported this conclusion. *Id.* at 468-69.

The court in *Eelbode* relied on a case from the Ninth Circuit Court of Appeals that applied Washington law, *Daly v. United States*, 946 F.2d 1467 (9th Cir. 1991). Like *Eelbode*, *Daly* involved a pre-employment physical examination. 946 F.2d at 1468. The issue was whether the examining physician had a duty to inform the plaintiff of abnormalities discovered during the examination in the absence of a physician-client relationship. *Id.* The court held that although the injured person must be a patient to assert a claim under RCW 7.70.030(2) and (3), there was no such requirement for a general negligence claim under RCW 7.70.030(1). *Id.* at 1469-70. The court refused to assume that Washington courts would create an exception to RCW 7.70.030(1) liability for pre-employment physicals.[1] *Id.* at 1470.

In *Judy v. Hanford Environmental Health Foundation*, Division Three of this court agreed with *Eelbode* and *Daly* and stated that the medical malpractice statute "extends malpractice liability beyond traditional physician-patient relationships." 106 Wn. App. 26, 37, 22 P.3d 810 (2001).

However, *Judy* demonstrates that there must be *some* type of direct connection between a physician and an injured person for RCW 7.70.030(1) liability to attach. In that case, an employer retained a physician to determine an employee's physical capacity to work in her position based on a functional capacity evaluation performed by another person. *Judy*, 106 Wn.

---

[1] Here, the issue is whether an IME physician is subject to the medical malpractice statute for injuries caused during an IME, and our holding is limited to that issue. We do not address whether an IME physician who fails to inform the person being examined of abnormalities discovered during the examination is subject to medical malpractice liability and we express no opinion on whether *Daly* was decided properly.

App. at 30. The employee filed a medical malpractice claim against the physician because he failed to advise her that he believed she lacked the physical capacity to work in her position. *Id.* at 31.

After noting the rule that no physician-patient relationship was required for RCW 7.70.030(1) liability, the court declined to impose medical malpractice liability on the physician because he did not conduct an examination or have any contact with the plaintiff. *Id.* at 37-39. The court stated:

> There can be no malpractice when there is not only no doctor-patient relationship, but no contact, no intent to diagnose, treat or otherwise benefit the patient, *no injury directly caused by the examination*, no failure to diagnose or notify the patient of an illness disclosed by the examination, and no dispute as to the accuracy of the reported results.

*Id.* at 39 (emphasis added).

Here, the IME was similar to the pre-employment physicals in *Eelbode* and *Daly*. As in those cases, the absence of a traditional physician-patient relationship between Dr. Newton and Reagan does not preclude the application of RCW 7.70.030(1). And unlike in *Judy*, Dr. Newton did have a connection with Reagan – he allegedly injured her during his examination.

Some courts in other jurisdictions have held that despite the absence of a traditional physician-patient relationship, an IME physician conducting an IME owes a duty not to injure the person being examined in the actual conduct of the physical examination and is subject to medical malpractice liability for such an injury. *E.g.*, *Dyer v. Trachtman*, 470 Mich. 45, 679 N.W.2d 311, 314-17 (2004); *Bazakos v. Lewis*, 12 N.Y.3d 631, 911 N.E.2d 847, 849-50 (2009); *Harris v. Kreutzer*, 271 Va. 188, 624 S.E.2d 24, 31-32 (2006).

The Michigan Supreme Court stated in *Dyer* that the relationship between the IME physician and the person being examined "is not the traditional one." 679 N.W.2d at 314. The court elaborated:

> It is a limited relationship. It does not involve the full panoply of the physician's typical responsibilities to diagnose and treat the examinee for medical conditions. . . . The limited relationship that we recognize imposes a duty on the IME physician to perform the examination in a manner not to cause physical harm to the examinee.

*Id.* at 314-15. We agree with this characterization and hold that a person being examined in an IME is the IME physician's "patient" with regard to injuries sustained in the physician examination.

Reagan makes several arguments against the rule stated in *Eelbode* that a physician-patient relationship is not required to assert a claim under RCW 7.70.030(1). First, she argues that the definition of "health care" clearly states that the plaintiff must be the physician's patient, and the meaning of "patient" as one in a physician-patient relationship is unambiguous. However, "patient" can have a generic meaning as someone who has an interaction with a health care provider without forming a traditional physician-patient relationship. *See* RCW 70.02.010(32) (defining "patient" for purposes of another statute as a person who receives heath care).

This generic meaning appears to be the way the term is used in the medical malpractice statute. As the court in *Eelbode* pointed out, the definition of "health care provider" in RCW 7.70.020(1) includes service providers that do not have formal relationships with the patient, including opticians, pharmacists, and paramedics. 97 Wn. App. at 467. Those providers would not be subject to liability under the medical malpractice statute under Reagan's position, making their inclusion in the definition of "health care provider" superfluous.

Second, Reagan argues that *Eelbode* is not controlling because the court did not expressly address the definition of "health care." However, the court unequivocally held that no physician-patient relationship was required for liability under RCW 7.70.030(1). *Id.* Because RCW 7.70.030 applies only to injuries caused by health care, the court necessarily held that "health care" does not require a physician-patient relationship.

Third, Reagan relies on *Paetsch v. Spokane Dermatology Clinic. PS*, 182 Wn.2d 842, 348 P.3d 389 (2015), and *Volk v. DeMeerleer*, 187 Wn.2d 241, 386 P.3d 254 (2016). In *Paetsch*, the Supreme Court noted that at common law, a plaintiff could not assert a medical malpractice claim absent a physician-patient relationship. 182 Wn.2d at 850. The court stated that some courts had "opined that the physician-patient relationship is no longer an element required to establish medical malpractice," citing *Eelbode* and *Judy*. *Id.* at 850 n.6. But the court stated that it did not need to decide the issue under the facts of that case. *Id.* at 850.

In *Volk*, the court again noted the common law rule and stated that a medical malpractice duty is owed to the physician's patient. 187 Wn.2d at 254. The court stated that in *Paetsch*, the court "previously declined to adopt the view that medical malpractice suits are available to nonpatient third parties against physicians." *Id.*

However, *Paetsch* and *Volk* involved a different issue than the one presented here. In *Paetsch*, the defendant was a doctor who had no contact with the plaintiff when she received treatment at a clinic that he owned. 182 Wn.2d at 845-47. In *Volk*, the plaintiffs were persons who filed a lawsuit against a psychiatrist to whom they had no connection for injuries and death caused by the psychiatrist's patient. 187 Wn.2d at 246, 250. The court in *Judy* held that a physician who had no contact with or connection to the plaintiff could not be liable under the medical malpractice statute. 106 Wn. App. at 39. But in *Eelbode*, *Daly*, and this case, the

plaintiffs actually were examined by the defendant even though no physician-patient relationship was formed.

Fourth, Reagan argues that an IME should not be considered "health care" because (1) there is no physician-patient confidentiality between the IME physician and an injured worker, (2) the physician sends his or her report to DLI and not to the worker's other health care providers, and (3) the physician may later testify against the interests of the worker. However, these factors demonstrate only that there is no physician-patient relationship between an IME physician and the person being examined. They do not answer whether a physician-patient relationship is necessary to assert a claim under RCW 7.70.030(1).

Reagan's arguments are not persuasive. In addition, her position would be detrimental to persons undergoing IMEs. As noted above, under the common law a person has no medical malpractice claim absent a physician-patient relationship. *Volk*, 187 Wn.2d at 254. Therefore, if the medical malpractice statute was inapplicable to IMEs, a person negligently injured by an IME physician's malpractice would have no remedy.

3.    Summary

Dr. Newton utilized his medical skills to examine Reagan. Although Dr. Newton did not have a traditional physician-patient relationship with Reagan, Reagan was Dr. Newton's "patient" in the generic sense that he interacted with and examined her. And he had a limited relationship with her in that he had a duty not to injure her during his examination. Accordingly, we hold that Dr. Newton's IME involved "health care" and therefore that RCW 7.70.030(1) governed his liability.

C.      SUFFICIENCY OF EXPERT TESTIMONY

Because the medical malpractice statute applies here, Reagan had the burden in opposition to summary judgment to present evidence establishing a genuine issue of fact that Dr. Newton failed to follow the accepted standard of care under RCW 7.70.030(1).[2]  In addition, Reagan was required to present evidence regarding the accepted standard of care.  *See* RCW 7.70.040(1); *Reyes*, 191 Wn.2d at 86.  Reagan argues that the expert medical testimony from Dr. Blackstone and Dr. Colville was sufficient to avoid summary judgment.  We disagree.

As noted above, breach of the applicable standard of care generally must be established through expert testimony.  *Reyes*, 191 Wn.2d at 86.  Both Dr. Blackstone and Dr. Colville opined that the acute onset of Reagan's left hip pain occurred as a result of Dr. Newton's manipulation of the hip during her May 2014 IME.  But these opinions focused only on causation.  Neither physician offered any opinion regarding the appropriate standard of care or whether Dr. Newton followed that standard of care during the IME.  Therefore, Reagan's evidence was insufficient to sustain a claim under RCW 7.70.030(1) and RCW 7.70.040(1).

Accordingly, we hold that the trial court did not err in granting summary judgment to Dr. Newton under RCW 7.70.030(1) because Reagan did not provide the required expert testimony that Dr. Newton violated the accepted standard of care.

D.      MEDICAL BATTERY CLAIM

Reagan argues that the trial court erred in dismissing her claim for medical battery because she presented sufficient evidence to support that claim.  Dr. Newton argues that

---

[2] In the trial court, Reagan argued that Dr. Newton also could be liable under RCW 7.70.030(2) and (3).  However, she does not assign error to the trial court's dismissal of claims under those subsections and she does not argue on appeal that she has valid claims under those subsections. Therefore, we do not address such claims.

summary judgment was appropriate because Reagan did not plead battery or any intentional conduct in her complaint and because the statute of limitations bars the claim. We reject Dr. Newton's procedural arguments, and hold that Reagan presented evidence in opposition to summary judgment that created a genuine issue of material fact regarding Dr. Newton's liability for medical battery.

    1.    Legal Principles

Under existing case law, the medical malpractice statute does not supersede the common law cause of action for medical battery. *Bundrick v. Stewart*, 128 Wn. App. 11, 16-17, 114 P.3d 1204 (2005); *see also Young*, 155 Wn. App. at 821-23.[3] A battery is an intentional harmful or offensive bodily contact with another person. *Kumar v. Gate Gourmet, Inc.*, 180 Wn.2d 481, 504, 325 P.3d 193 (2014). A person is liable for battery if he or she intends to cause a harmful or offensive contact and such a contact directly or indirectly results. *Id.* The intent element is satisfied if a defendant knows to a substantial certainty that his or her actions will result in the contact. In other words, the requisite intent for battery is to cause an offensive contact, not an injury. *Sutton*, 180 Wn. App. at 866.

A person commits battery only if the person receiving the contact has not consented. *See Kumar*, 180 Wn.2d at 505. Therefore, consent is a defense. *Morinaga v. Vue*, 85 Wn. App. 822,

---

[3] The holding in *Bundrick*, which this court cited with approval in *Young*, seems inconsistent with the language of RCW 7.70.010. That statute states that the medical malpractice statute applies to "all civil actions and causes of action, whether based on tort, contract, or otherwise, for damages for injury occurring as a result of health care." The Supreme Court has stated, " '[W]henever an injury occurs as a result of health care, the action for damages for that injury is governed exclusively by RCW 7.70.' " *Fast*, 187 Wn.2d at 34 (alteration in original) (quoting *Branom*, 94 Wn. App. at 969). These cases suggest that medical battery would fall within the medical malpractice statute if the claim arose from health care. But Dr. Newton does not argue that medical battery is not a viable claim apart from chapter 7.70 RCW. Therefore, we do not address this issue.

834, 935 P.2d 637 (1997). However, where the plaintiff consents to a medical procedure, limitations on that consent will be effective if the plaintiff communicates those limitations. *Bundrick*, 128 Wn. App. at 18.

2. Failure to Assert Claim in Complaint

Dr. Newton initially argues that Reagan's complaint failed to assert a medical battery claim. We agree.

Under CR 8(a), a complaint must contain "(1) a short and plain statement of the claim showing that the pleader is entitled to relief and (2) a demand for judgment for the relief to which the pleader deems the pleader is entitled." This rule allows "notice pleading." *See Champagne v. Thurston County*, 163 Wn.2d 69, 84-87, 178 P.3d 936 (2008). However, the complaint still must adequately inform the defendant of the nature of the plaintiff's claims as well as the legal grounds upon which those claims rest. *Kirby v. City of Tacoma*, 124 Wn. App. 454, 469-70, 98 P.3d 827 (2004).

Here, Reagan's complaint alleged that "[d]uring the course of the examination, [Dr. Newton] manipulated plaintiff's hip in a manner that subsequently caused injury." CP at 2. The complaint requested a "judgment against [Dr. Newton] for all general and special damages suffered as a result of [his] *negligence*." CP at 2 (emphasis added). The complaint did not assert a claim for battery or any other intentional tort.

Reagan claims that the allegations in her complaint were sufficient to assert medical battery because the allegations were consistent with that claim. However, notice pleading under CR 8 does not allow a plaintiff to allege only the factual basis in its pleading, leaving the plaintiff unrestricted as to any particular legal theory. *See Pac. Nw. Shooting Park Ass'n v. City of Sequim*, 158 Wn.2d 342, 352, 144 P.3d 276 (2006); *Trask v. Butler*, 123 Wn.2d 835, 846, 872

P.2d 1080 (1994). A complaint is insufficient if it fails to give the defendant fair notice of the claims asserted. *Pac. Nw.*, 158 Wn.2d at 352.

Reagan asserted only a negligence claim in her complaint. We hold that the complaint language was insufficient to assert a medical battery claim.

3. Application of CR 15(b)

Reagan argues that even if she did not plead a medical battery claim, the battery claim was argued by consent of the parties and therefore should be treated under CR 15(b) as if the claim was raised in her complaint. We agree.

CR 15(b) states, "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." In determining whether the parties impliedly tried an issue, we consider the record as a whole, including whether the issue was mentioned before trial, and the legal and factual support for the trial court's conclusions regarding the issue. *Dewey v. Tacoma Sch. Dist. No. 10*, 95 Wn. App. 18, 26, 974 P.2d 847 (1999). However, "[a] party who does not plead a cause of action or theory of recovery cannot finesse the issue by later inserting the theory into trial briefs and contending it was in the case all along." *Id.*

a. Case Law

Several cases have addressed situations where a plaintiff raised an unpleaded claim for the first time in opposition to summary judgment. In *Reichelt v. Johns-Manville Corp.*, the plaintiff raised a new negligence claim. 107 Wn.2d 761, 767, 733 P.2d 530 (1987). However, the parties addressed negligence in their briefs and argued the merits of the issue at the summary judgment hearing, and the trial court ruled on the issue. *Id.* at 767. The Supreme Court held that

under CR 15(b), the inadequacies of the plaintiff's complaint did not preclude an appellate court from considering the issue. *Id.* at 768.

In *Denny's Restaurants Inc. v. Security Union Title Insurance*, the plaintiff raised a new mutual mistake claim. 71 Wn. App. 194, 213-14, 859 P.2d 619 (1993). The defendant responded to the claim on the merits in its reply. *Id.* at 213. The trial court also heard oral argument on the issue, although the defendant did point out at that time that the new issue had not been raised in the complaint. *Id.* at 214. On these facts, Division One of this court held that, "[i]t appears from the record that this issue was essentially litigated before the trial court," and therefore the trial court had abused its discretion by not allowing for an amendment of the complaint under CR 15(b). *Id.*

In *Dewey*, the plaintiff argued for the first time in response to the defense's motion to dismiss that termination of his employment violated the First Amendment. 95 Wn. App. at 26. The defendant's reply brief did not mention the First Amendment claim, although during oral argument the defendant argued that the plaintiff had failed to plead that theory of recovery. *Id.* The court held that the trial court did not err in ruling that the First Amendment claim was not tried by implication. *Id.* The court stated that the defendant's argument that the plaintiff had failed to plead a First Amendment theory of recovery did not constitute a trial of the issue. *Id.*

In *Kirby*, the plaintiff raised a new First Amendment claim in opposition to summary judgment. 124 Wn. App. at 469. The defendant argued at the summary judgment hearing that the plaintiff had failed to plead a First Amendment theory of recovery. *Id.* at 471. Only after this argument did the defendant "hesitantly" argue the claim's merits. *Id.* This court refused to apply CR 15(b). *See id.* at 470-72. Citing *Dewey*, the court stated that a defendant's argument that the plaintiff failed to plead a claim did not constitute a trial of the issue under CR 15(b).

*Kirby*, 124 Wn. App. at 471. Further, the defendant "should not be penalized for attempting a defense for which it was ill prepared as a result of [the plaintiff's] procedural failures." *Id.* Finally, the court quoted with approval a Seventh Circuit case: " 'A plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment.' " *Id.* at 472 (quoting *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996).

        b.    Analysis

Here, Reagan raised medical battery for the first time in her response to Dr. Newton's summary judgment motion. She noted that battery involves a nonconsensual touching and stated that she did not consent to the manipulation of her hip. Dr. Newton did not address medical battery in his reply brief.

At oral argument on the summary judgment motion, Dr. Newton did not object to Reagan's medical battery claim on the basis that it had not been raised in her complaint. Instead, he discussed applicable case law and argued that the medical battery theory did not apply to the facts because Reagan had consented to Dr. Newton's performance of the IME. Reagan responded that there was "clearly a question of fact in terms of whether or not there's a medical battery here." Report of Proceedings (RP) at 21. Reagan also pointed out "that the defense raised nothing in its reply with respect to the medical battery." RP at 23. In response, Dr. Newton briefly argued again that there could be no medical battery claim because Reagan had consented to the IME.

It is unclear whether or not the trial court considered the medical battery claim. The court asked no questions during oral argument, took the matter under advisement, and did not issue an oral ruling. The court later issued a written summary judgment order that dismissed without comment "[t]he claims asserted by the Plaintiff." CP at 216.

Under *Dewey* and *Kirby*, Dr. Newton's argument on the merits at the summary judgment hearing does not necessarily preclude him from asserting that CR 15(b) is inapplicable. As this court noted in *Kirby*, a defendant should not be penalized for attempting a defense to an unpleaded claim where the defendant's lack of preparation is the result of the plaintiff's procedural failures. 124 Wn. App. at 471. However, in both of those cases the defendant argued at the summary judgment hearing that the new claim had not been pleaded in the complaint. *Id.*; *Dewey*, 95 Wn. App. at 26. Even the defendant in *Denny's* raised the plaintiff's failure to plead the new claim. 71 Wn. App. at 214. Here, Dr. Newton made no such argument and never objected to addressing the medical battery claim on the merits.

Based on Dr. Newton's failure to object to Reagan asserting the medical battery claim and arguing that claim on the merits, we hold that the summary judgment proceedings amounted to a trial of the claim by implication under CR 15(b). Accordingly, we apply CR 15(b) and treat the medical battery claim as if it had been raised in the complaint.

4.    Statute of Limitations

Dr. Newton argues that even if we can consider Reagan's medical battery claim under CR 15(b), that claim is barred by the statute of limitations. We disagree.

The statute of limitations for common law battery claims is two years. RCW 4.16.100(1). Reagan alleges that she was injured on May 13, 2014. She filed her lawsuit against Dr. Newton on December 14, 2015, well within the statute of limitations. But Dr. Newton points out that Reagan did not raise the medical battery claim until she filed her summary judgment response on June 12, 2017, which was more than two years after she filed suit.

However, CR 15(b) states that if issues are tried by express or implied consent, the issues "shall be treated *in all respects* as if they had been raised in the pleadings." (Emphasis added.)

21

"In all respects" necessarily includes treating the issue as pleaded at the time of the original complaint for statute of limitations purposes. *See Reichelt*, 107 Wn.2d at 766-73. Therefore, we reject Dr. Newton's statute of limitations argument.

5.   Summary Judgment on Medical Battery Claim

Because Reagan's medical battery claim must be treated as if the claim was raised in the complaint, we address whether Reagan provided sufficient evidence to avoid summary judgment. We hold that the trial court erred in dismissing the medical battery claim on summary judgment.

Reagan cited her own deposition and Wilson's declaration to support the conclusion that Dr. Newton intentionally "yanked," CP at 114, on Reagan's leg after she withdrew her consent to be touched further. Both remember Reagan telling Dr. Newton "that's as far as it goes" before he further rotated her leg from the hip, causing Regan to cry out in pain. CP at 114. Both also recall Dr. Newton then saying something to the effect of, "That's the response I was looking for." CP at 110, 114. This testimony is sufficient to create genuine issues of fact regarding the existence of an offensive contact, Dr. Newton's intent to cause that contact, and Reagan's withdrawal of any consent to further rotate her hip.

Dr. Newton raises three brief arguments on the merits of the medical battery claim. First, he argues that Reagan relies only on her own self-serving testimony that he intentionally injured her. But a party's declaration is enough to create a question of fact where her deposition testimony was based on her personal observations of the defendant's conduct. *Sutton*, 180 Wn. App. at 866. On a summary judgment motion brought by the opposing party, we must treat the plaintiff's eyewitness testimony as true, even if it is self-serving. *Id.*

Second, Dr. Newton argues that Reagan consented to the IME and did not show that she did not consent to his touching of her as required in *Bundrick*, 128 Wn. App. at 18. But viewed in the light most favorable to Reagan, both her testimony and Wilson's testimony support an inference that Reagan asked Dr. Newton to stop pushing on her hip and thereby withdrew her consent to that maneuver.

Third, Dr. Newton argues that Reagan submitted no admissible evidence that he intended to cause her harm. But both Reagan and Wilson testified that after Reagan cried out in pain, Dr. Newton stated that he was looking for that response. And as noted above, the requisite intent for battery is to cause the offensive contact, not the actual harm. *Kumar*, 180 Wn.2d at 504-05; *Sutton*, 180 Wn. App. at 865-66.

Genuine issues of material fact existed regarding Dr. Newton's liability for medical battery. Accordingly, we hold that that the medical battery claim should not have been dismissed.

## CONCLUSION

We affirm the trial court's dismissal of Reagan's medical malpractice claim, but we reverse the trial court's dismissal of Reagan's medical battery claim and remand for further proceedings.

_____
MAXA, C.J.

We concur:

_____
MELNICK, J.

_____
SUTTON, J.