## NOTICE: SLIP OPINION
### (not the court's final written decision)

The opinion that begins on the next page is a slip opinion. Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision. Slip opinions can be changed by subsequent court orders. For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion. Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports. An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.** The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports. Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| CARL W. PADDOCK, a single person, | No. 56466-1-II |
| Appellant, | |
| v. | |
| THE PORT OF TACOMA, | PUBLISHED OPINION |
| Respondent. | |

GLASGOW, C.J.—A longshoreman sued an equipment manufacturer after a machine he was using at work at the Port of Tacoma flipped over, injuring him. Carl W. Paddock, an equipment maintenance mechanic for the Port, was subpoenaed to testify in a deposition in the longshoreman's lawsuit. The accident occurred approximately four years before Paddock's deposition testimony. Paddock testified under oath that he had taken the machine out of commission the day before the accident so the machine's brakes could be repaired. Port records ultimately showed Paddock was incorrect.

After learning about Paddock's testimony, the Port hired an outside investigator to determine whether Paddock had knowingly provided false information during his deposition. The investigator concluded that Paddock had lied and that his testimony had caused workplace disruption. The Port fired Paddock based on the investigator's report.

No. 56466-1-II

Paddock then sued the Port. He made claims for wrongful discharge in violation of public policy and retaliation for multiple grievances he had filed against the Port. Paddock alleged that he had incurred damages for lost income.

The Port moved for summary judgment. The trial court dismissed Paddock's claims and found that Paddock was judicially estopped from receiving lost income after he began receiving unrelated disability benefits. Paddock appeals, arguing that the trial court erred in granting summary judgment to the Port.

We reverse the dismissal of Paddock's wrongful discharge in violation of public policy claim and conclude that Paddock is judicially estopped from arguing that he would have been able to work as a mechanic for the Port after he had surgery in July 2017. We otherwise affirm. We remand for further proceedings regarding the wrongful discharge in violation of public policy claim.

FACTS

I. BACKGROUND

Paddock began working for the Port as an equipment maintenance mechanic in 1999. His job required him to maintain straddle carriers. A "straddle carrier" is a "vehicle used to stack, unload, and move containers, such as those shipped on railcars." Clerk's Papers (CP) at 365.

Paddock belonged to a union, and his employment with the Port was governed by a collective bargaining agreement. In his years with the Port, Paddock filed multiple union grievances. His grievances alleged retaliation for raising safety concerns, unfair investigations and discipline, harassment, and age discrimination. His grievance outcomes varied. There were

2

No. 56466-1-II

findings that at least one grievance was valid, the Port entered into settlement agreements regarding at least two grievances, and at least three other grievances resulted in denials.

In 2012, Robert Edwards, a longshoreman for the Port, was operating a straddle carrier that flipped over. The incident injured Edwards. He sued the straddle carrier's manufacturer in federal court, contending that the product's braking system was unsafe. In 2016, Edwards's attorneys subpoenaed Paddock to testify about the accident and subsequently deposed him.

At the deposition, Paddock testified that the day before the accident, someone had reported to the Port's maintenance facility that the straddle carrier's brakes were "'chattering violently.'" CP at 296. Paddock said he and his colleague, Steve Hughes, inspected the straddle carrier's brakes and found that "the braking [system] was severely compromised." *Id.* Paddock then tagged the straddle carrier to signify that it should not "be used until it [had] been fully repaired and inspected." CP at 297. He explained that only a manager or the person who assigned the tag would have been able to authorize its removal. Paddock said that when he came to work the next day— the day of the accident—he noticed that the straddle carrier was in operation. He stated that he told Hughes, "'That machine's out working. It shouldn't be.'" CP at 315. Paddock thought the machine could not have been repaired while he was away because of the severity of the problem with the brakes.

During his deposition, Paddock expressed confusion about the details surrounding the accident, which had occurred about four years earlier. Several times, he said he could not give specific dates for the tagging or the accident itself. When Edwards's attorney asked Paddock whether the day before the accident was August 29, 2012, Paddock said, "I'm not real sure of the date. It's been a long time." CP at 313. The attorney asked, "If the tipover was on August 30th,

3

No. 56466-1-II

then it would have been August 29th that the safety problem with the brakes was brought to your

attention?" *Id.* Paddock replied, "Apparently, yes." *Id.*

Later in the deposition, the manufacturer's attorney showed Paddock a timecard indicating

that Hughes was on vacation on the day of the accident and the day before it:

> Q. Mr. Hughes wasn't with you when you tagged [the straddle carrier], the day
> before it tipped over; isn't that correct?
> A. No.
> Q. No what?
> A. That's not correct.
> Q. You're saying the records are wrong?
> A. I'm saying [Hughes] was with me or there when I tagged the machine out, yes.
> Q. On August 29th, 2012?
> A. I don't know the exact date.
> Q. It's the day before the tipover, correct?
> A. I don't know what date the tipover was.
> Q. Well, take my representation it's August 30th, 2012.
> A. Okay.
> Q. If that's true, then Mr. Hughes wasn't working August 30th, 2012, and he wasn't
> working on August 29th, 2012. He was on vacation, wasn't he?
> A. That's what the records show.
> Q. And you are testifying differently than the records, correct?
> A. Apparently. That's what I recall what I'm testifying.

CP at 319. Nevertheless, Paddock did not retract his statement that on the day before the accident,

he tagged the straddle carrier to indicate that it should not be used.

## II. EMPLOYMENT INVESTIGATION AND TERMINATION

About a month after Paddock's deposition, the Port hired an outside investigator to

determine whether Paddock "knowingly provided false information about the Port . . . when

subpoenaed to testify" and how Paddock's testimony "impacted the Port and his coworkers." CP

at 365. The Port then placed Paddock on administrative leave for the duration of the investigation.

The investigation was to determine "whether information [Paddock] provided in the

[longshoreman's] litigation was maliciously untrue and/or whether [Paddock's] actions in relation

4

No. 56466-1-II

to the accident leading to the [litigation] failed to meet workplace and safety expectations." CP at 294.

The investigator interviewed Paddock. In her report, the investigator wrote that when she spoke with him, Paddock described the straddle carrier accident differently than he had in his deposition testimony. She wrote that Paddock "acknowledged he had previously testified that the tagging incident occurred the day before the accident," but "now . . . realized that his dates were off, because he had learned Mr. Hughes wasn't at work on the day before the accident." CP at 371. She added that later in the interview, Paddock "said the tagging incident was 'shortly' before the accident, the way he remembered it," but when she asked him "to estimate how close in time the two events were . . . he said he could not do so, or even say whether they were a few days, a few weeks, or a few months apart." *Id.* She wrote that Paddock "said he had no concerns about" the straddle carrier that flipped over "on the day of the accident." *Id.* And she wrote that when she asked Paddock "whether he had a reason to think the brake problem for which he tagged" the straddle carrier "had anything to do with the accident," Paddock said that "he didn't know" and that "there were many possibilities of what caused it." CP at 372.

The investigator interviewed other Port employees. Her report stated that when she spoke with Hughes, Hughes said Paddock only brought up tagging the straddle carrier "years after the accident, around the time of the [longshoreman's] lawsuit." CP at 375. Additionally, other unidentified witnesses did "not recall any time that . . . Paddock tagged a [straddle carrier] but the [straddle carrier] was then put into service the next day without having been repaired." CP at 376. And according to witnesses, Paddock had "a history of accusing the Port, supervisors, and coworkers of improper conduct, often supporting his complaints with false allegations." CP at 377.

5

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 56466-1-II

The investigator listed additional evidence that contradicted Paddock's testimony. She wrote that work orders for the straddle carrier from "the month preceding the accident [did] not list any work reflecting the kind of brake problems" Paddock and Hughes had described as leading to the straddle carrier "being tagged out." CP at 375. She also wrote that the straddle carrier's diagnostic system "was reviewed for the two weeks prior to the accident," and it showed "no incidents involving such brake problems." *Id.*

The investigator found Paddock's explanation that he had "simply been mistaken in the deposition about the dates involved [was] not credible." CP at 379. The investigator concluded "that critical aspects of [Paddock's] deposition testimony were knowingly false, not simply mistaken." CP at 377. She explained, "Although an individual's motives are often difficult to establish with certainty, the evidence indicates Mr. Paddock provided false testimony in order to cast a bad light on the Port, his supervisors, and coworkers." CP at 380. And she noted that when Paddock testified, he had reason to be upset with the Port because he had recently "been found guilty of" purposefully "bumping into two coworkers." *Id.*

Port executives then terminated Paddock based on the investigator's finding that Paddock knowingly gave false testimony and that "this false testimony . . . contributed to unnecessary tension, anxiety[,] and mistrust in the workplace." CP at 382. Paddock's employment with the Port ended on February 28, 2017.

### III. PADDOCK'S WORKPLACE INJURY AND DISABILITY

On February 13, 2017, while Paddock was on administrative leave and before he was fired, he reopened a workplace shoulder injury claim. A doctor determined that he would need surgery

No. 56466-1-II

and that it was unlikely he would be able to work as a heavy equipment mechanic after the procedure.

On March 6, 2017, after the Port terminated him, Paddock went to a follow-up appointment for his shoulder injury. The doctor's visit note stated, "At this point he cannot do his job of injury and will have restrictions [on] lifting more [than] 10 pounds and [on] reaching with the right arm." CP at 410. Nevertheless, Paddock maintained that he could still perform his mechanic work because he was "nursing" his shoulder and he had help from others doing the required work. CP at 431. He explained, "I had a plan to have my shoulder repaired after I retired. And I had helpers with me . . . helping me do the work. So[,] I was . . . able to get it done with my experience." CP at 431-32.

Paddock had shoulder replacement surgery on July 19, 2017. At a Board of Industrial Insurance Appeals hearing, Paddock testified that after he had the surgery, he became physically incapable of doing the job he had with the Port.

In 2019, Paddock applied for disability benefits with the Social Security Administration. In that application, he alleged that because of his shoulder replacement surgery and other medical challenges, he had been unable to work since February 13, 2017. In a disability determination explanation, the Social Security Administration determined that Paddock became disabled on February 13, 2017, concluding that his disability restricted him to performing sedentary work as of that date.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 56466-1-II

IV. PADDOCK'S LAWSUIT

Paddock sued the Port for wrongful termination. He brought claims for wrongful discharge in violation of public policy and retaliation.[1] He alleged that because of the termination, he had incurred damages for "past and future income loss" and "past and future loss of benefits," among other damages. CP at 2.

The Port moved for summary judgment to dismiss all of Paddock's claims. It also argued that if any claims were to survive summary judgment, Paddock was judicially estopped from claiming lost wages after February 13, 2017, because the Social Security Administration had determined that he stopped being able to work on that date.

Paddock's response to the Port's motion included his own declaration, a declaration from Hughes, and a declaration from an attorney who had deposed him for the longshoreman's litigation. Paddock said he "had no agenda for the deposition and was there merely to answer questions about what [he] remembered." CP at 769. Hughes said he believed Paddock had testified based on his memory.

The attorney who had deposed Paddock explained in his declaration that throughout the deposition, Paddock "was unsure of exact dates, as the events he was testifying about occurred four years prior." CP at 747. The attorney stated, "My impression at the time, and now, was that Mr. Paddock was testifying to the best of his ability and his recollection of events that occurred more than four years before his deposition." CP at 748. The attorney also said, "It was clear to me that at no time during the deposition did Mr. Paddock engage in any behavior I perceived to suggest

---

[1] Paddock made other claims that the trial court dismissed. Paddock does not assign error to these dismissals on appeal.

8

No. 56466-1-II

that he was intentionally lying." *Id.* The attorney concluded: "I recall a man unfamiliar with the legal process struggling to make his best effort to recall what had occurred several years prior, to the best of his ability." CP at 749.

At the summary judgment hearing, the trial court stated it was granting the Port partial summary judgment on Paddock's claim for lost wages. The trial court explained that there was "no dispute as to [Paddock's] disability," and that as "a matter of law," Paddock was "estopped from arguing otherwise." Verbatim Rep. of Proc. (Oct. 8, 2021) at 47-48.

After the hearing, the trial court also granted the Port's summary judgment motion and dismissed all of Paddock's claims. The court entered findings of fact to support its decision even though it was granting summary judgment. Paddock appeals.

ANALYSIS

Paddock argues that the trial court erred when it granted the Port's summary judgment motion. He contends that he was discharged "in violation of public policy and as a result of" the Port's "retaliatory conduct." Appellant's Opening Br. at 39. He further contends that the trial court "improperly foreclosed [his] claim for lost income." *Id.* at 60. We reverse the trial court's dismissal of Paddock's wrongful discharge in violation of public policy claim, but we conclude that Paddock is estopped from arguing that he would have been able to work as a mechanic for the Port after his surgery in July 19, 2017. We otherwise affirm.

We review a trial court's dismissal on summary judgment de novo. *Mackey v. Home Depot USA, Inc.*, 12 Wn. App. 2d 557, 569, 459 P.3d 371 (2020). Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party

9

No. 56466-1-II

is entitled to a judgment as a matter of law." CR 56(c). "'A material fact is one upon which the outcome of the litigation depends.'" *Mattingly v. Palmer Ridge Homes LLC*, 157 Wn. App. 376, 387, 238 P.3d 505 (2010) (quoting *Balise v. Underwood*, 62 Wn.2d 195, 199, 381 P.2d 966 (1963)). A genuine issue of material fact exists where "reasonable minds could disagree on the facts controlling the outcome of the case." *Mackey*, 12 Wn. App. 2d at 569.

"When determining whether an issue of material fact exists," we "must construe all facts and inferences in favor of the nonmoving party." *Ranger Ins. Co. v. Pierce County*, 164 Wn.2d 545, 552, 192 P.3d 886 (2008). On summary judgment, "a nonmoving party's declaration must be taken as true and can create a genuine issue of material fact even if it is 'self-serving.'" *Mackey*, 12 Wn. App. 2d at 575 (quoting *Reagan v. Newton*, 7 Wn. App. 2d 781, 806, 436 P.3d 411 (2019)).

As an initial matter, the trial court entered findings of fact in support of its summary judgment decision, but findings of fact "'are not necessary on summary judgment and, if made, are superfluous.'" *Johnson v. Lake Cushman Maint. Co.*, 5 Wn. App. 2d 765, 776, 425 P.3d 560 (2018) (internal quotation marks omitted) (quoting *Nelson v. Dep't of Lab. & Indus.*, 198 Wn. App. 101, 109, 392 P.3d 1138 (2017)). Therefore, we do not address the trial court's findings of fact. *Id.*

## I. WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY

Paddock argues that there is a genuine question of material fact about whether the Port discharged him in violation of public policy. First, he contends that it is a violation of public policy to terminate an employee for performing a public duty, so the Port's decision to terminate him for testifying to the best of his ability in response to a subpoena was unlawful. Second, he contends that it is a violation of public policy to terminate an employee for exercising a legal right, and "he

10

No. 56466-1-II

was exercising a legal right . . . by filing grievances against Port management." Appellant's Opening Br. at 41. Paddock emphasizes that he does not claim to have been whistleblowing. We agree with Paddock that the trial court erred in dismissing his wrongful discharge in violation of public policy claim.

A.    Wrongful Discharge Framework

Wrongful discharge in violation of public policy is a tort that encourages "both employers and employees to follow the law." *Rose v. Anderson Hay & Grain Co.*, 184 Wn.2d 268, 275, 358 P.3d 1139 (2015). The public policy the employee identifies must "be judicially or legislatively recognized," *id.* at 276, and it may arise from state or federal law. *See Sedlacek v. Hillis*, 145 Wn.2d 379, 392, 36 P.3d 1014 (2001). The requirement that the public "policy be judicially or legislatively recognized protects employers from having to defend against amorphous claims of public policy violations and addresses the employers' legitimate concern that a broad common law tort would considerably abridge their ability to exercise discretion in managing and terminating employees." *Rose*, 184 Wn.2d at 276. Additionally, the tort "is not designed to protect an employee's purely *private interest* in [their] continued employment; rather, the tort operates to vindicate the *public interest* in prohibiting employers from acting in a manner contrary to fundamental public policy." *Smith v. Bates Tech. Coll.*, 139 Wn.2d 793, 801, 991 P.2d 1135 (2000).

"To establish a prima facie case of wrongful discharge in violation of public policy, an employee must show" that their "'discharge may have been motivated by reasons that contravene a clear mandate of public policy'" and "that the public-policy-linked conduct was a significant

11

No. 56466-1-II

factor in the decision to discharge" them. *Mackey*, 12 Wn. App. 2d at 577-78 (internal quotation marks omitted) (quoting *Martin v. Gonzaga Univ.*, 191 Wn.2d 712, 725, 425 P.3d 837 (2018)).

We generally limit wrongful discharge in violation of public policy claims to four categories: termination for refusing to commit an illegal act; termination for performing a public duty or obligation, such as jury duty; termination for exercising a legal right or privilege; and termination in retaliation for whistleblowing. *Id.* at 578.

Once a plaintiff makes a prima facie showing that they were wrongfully discharged in violation of public policy, the burden of proof shifts to the employer, who must articulate a legitimate reason for the discharge. *Id.* at 580. The burden is one of production, not persuasion, so the employer only needs to introduce evidence that, taken as true, permits the conclusion that its reason was lawful. *Id.* at 580-81.

If the employer can articulate a legitimate reason, "the burden shifts back to the employee to produce sufficient evidence to establish" that "the employer's alleged . . . reason for the adverse employment action was pretextual or that even if the stated reason was legitimate, . . . violation of public policy also was a substantial motivating factor." *Id.* at 581.

B.      Public Duty or Obligation

We hold that the trial court erred in granting summary judgment in favor of the Port on Paddock's claim of wrongful discharge in violation of public policy. There is a genuine question of material fact about whether the Port discharged Paddock for performing a public duty or obligation.

Paddock was subpoenaed to testify in a federal court case. A federal district court may hold a person in contempt if they have been served with a subpoena and they fail "without adequate

12

No. 56466-1-II

excuse to obey the subpoena or an order related to it." FED. R. CIV. P. 45(g). A court's contempt authority is "a power 'necessary to the exercise of all others.'" *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 831, 114 S. Ct. 2552, 129 L. Ed. 2d 642 (1994) (quoting *United States v. Hudson and Goodwin*, 11 U.S. (7 Cranch) 32, 34, 3 L. Ed. 259 (1812)). "Courts independently must be vested with 'power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates.'" *Id.* (quoting *Anderson v. Dunn*, 19 U.S. (6 Wheat.) 204, 227, 5 L. Ed. 242 (1821)).

A person who has been subpoenaed to testify at a deposition is guilty of perjury if, after taking an oath to tell the truth, they "willfully and contrary to such oath" make a statement about "any material matter" that they do "not believe to be true." 18 U.S.C. § 1621(1). Perjury is a crime because "the perpetration of perjury 'well may affect the dearest concerns of the parties before a tribunal.'" *Bronston v. United States*, 409 U.S. 352, 357, 93 S. Ct. 595, 34 L. Ed. 2d 568 (1973) (quoting *United States v. Norris*, 300 U.S. 564, 574, 57 S. Ct. 535, 81 L. Ed. 808 (1937)).

A person who testifies in response to a subpoena performs a public obligation, but an employee is not absolutely protected every time they testify in a legal proceeding. *See Blinka v. Wash. State Bar Ass'n*, 109 Wn. App. 575, 586, 588, 36 P.3d 1094 (2001). In *Blinka*, Division One stated that CR 45, the state equivalent of Federal Rule of Civil Procedure 45, and federal and state laws against perjury "provide the foundation for a public policy prohibiting adverse employment action for responding to a subpoena or refusing to give false testimony." *Id.* at 585. Although Division One declined to recognize this public policy "in light of the already-existing protections" for Blinka's conduct under the Law Against Discrimination, chapter 49.60 RCW, it recognized that CR 45 "contains an implied obligation that the party in receipt of a properly issued subpoena

13

No. 56466-1-II

comply with the order to appear." *Id.* at 585-86. The *Blinka* court also recognized that "by criminalizing false statements made under oath, the state and federal perjury statutes . . . inversely imply a witness's obligation to give truthful and forthright testimony." *Id.* We agree and conclude that there is a public duty or obligation to appear when subpoenaed and to testify truthfully to the best of the witness's ability.

Here, Paddock responded to a subpoena and testified under oath. Paddock admits that his testimony in the deposition was incorrect to some extent. He maintains that he testified to the best of his ability, but he made a mistake. The Port contends that it terminated Paddock because "he deliberately testified falsely, and his false accusations created disruption in the workplace." Br. of Resp't at 1.

The record contains conflicting information about whether Paddock lied. On one hand, an outside investigator's detailed report concluded that "critical aspects of [Paddock's] deposition testimony were knowingly false." CP at 377. On the other hand, in Paddock's declaration, he said he testified consistently with his imperfect memory of an incident that occurred four years before the deposition. Hughes testified similarly. And a declaration from the attorney who had deposed Paddock after the accident stated that "Paddock was testifying to the best of his ability" based on "his recollection of events that occurred more than four years before his deposition." CP at 748. The attorney present in the deposition concluded that Paddock was not being intentionally untruthful.

There is thus a genuine question of fact about whether Paddock lied in his deposition. This question is material to the issue of whether the Port discharged Paddock for performing a public duty or obligation. If, in responding to the subpoena, Paddock made statements he believed to be

14

No. 56466-1-II

true, he can make a prima facie case that he was performing a public obligation for which the Port could not lawfully discharge him. But if Paddock knowingly and willfully made statements he did not believe to be true, he was not performing a public obligation when he testified falsely, and he cannot make a prima facie case for wrongful discharge in violation of public policy.

Under the summary judgment standard, we must view the evidence in the light most favorable to Paddock and we must assume his declaration, and those of Hughes and the attorney present in the deposition, are true. Under that standard, Paddock has made a prima facie case that he was performing a public duty or obligation.

The burden then shifts to the Port to articulate a legitimate reason for discharging Paddock. The burden is one of production, not persuasion, so we ask only whether the Port's evidence, taken as true, permits the conclusion that its reason for firing Paddock was lawful. *Mackey*, 12 Wn. App. 2d at 580-81. The Port presented evidence in the form of the investigator's report, explaining that it terminated Paddock for deliberately lying when he testified in response to a subpoena. *See* Br. of Resp't at 31-32. Assuming the Port's evidence is true, this would be a lawful reason for terminating Paddock's employment.

Finally, "the burden shifts back to the employee to produce sufficient evidence to establish" that "the employer's alleged . . . reason for the adverse employment action was pretextual *or that even if the stated reason was legitimate . . . violation of public policy also was a substantial motivating factor*." *Mackey*, 12 Wn. App. 2d at 581 (emphasis added). Here, we view the evidence in the light most favorable to Paddock, as we must at the summary judgment stage. Paddock has presented evidence that he testified to the best of his ability in response to a subpoena, and although some of his answers were mistaken, he was not intentionally untruthful. If Paddock's version of

15

No. 56466-1-II

the facts is correct, then a substantial motivating factor for his termination was his performance of a public obligation, namely testifying truthfully to the best of his ability in response to a subpoena. The Port's only reason for terminating Paddock's employment was his deposition testimony.

At trial, the Port may be able to prove that Paddock intentionally lied in the deposition. But it is also true that Paddock may be able to prove at trial that he did not intentionally lie in the deposition. There is a genuine issue of material fact as to whether the Port's termination of Paddock's employment actually violated public policy.

The Port relies on *Mackey*, arguing that even if there is a genuine issue of material fact about whether the results of its investigation were accurate, it is still entitled to summary judgment because Paddock has not shown that the reason it gave for firing him was pretextual. The Port relies on the reasoning in *Mackey* stating that the accuracy of the employer's investigation in that case did not matter so long as the investigation results provided the basis for the decision to terminate employment. Thus, the Port asserts that under *Mackey*, it is still entitled to summary judgment.

*Mackey* is distinguishable from this case because here, there is a question of fact about whether violation of public policy was a substantial motivating factor for Paddock's termination, but in *Mackey*, there was not. In *Mackey*, the employee argued that the employer discharged her in violation of public policy because it fired her in retaliation for whistleblowing. *Id.* at 578. The employer responded that it had a legitimate reason for terminating her employment, namely an investigation revealing that she gave "an estimated $17,000 in unauthorized discounts." *Id.* at 580. We held that the employee failed to show that her whistleblowing was also a substantial motivating factor for the termination, reasoning that the employee had "not presented any direct or indirect

16

No. 56466-1-II

evidence that some reason other than the results of the investigation" played a substantial part in the employer's decision. *Id.* at 585.

In contrast, here, the pretermination investigation was about Paddock testifying in response to a subpoena—the very action he argues constituted the performance of a public obligation. Therefore, if Paddock can show that he made statements he believed to be true and thus performed a public obligation by testifying truthfully in response to a subpoena, he can show that violation of public policy was a substantial motivating factor for his termination. And Paddock presented sworn declarations that he testified truthfully, if incorrectly. Thus, he has established a genuine issue of material fact preventing dismissal of his wrongful discharge in violation of public policy claim.

We hold that the trial court erred in granting summary judgment in favor of the Port on Paddock's claim of wrongful discharge in violation of public policy. Because we remand for further proceedings regarding this prong of wrongful termination in violation of public policy, we need not address Paddock's argument that he was discharged in violation of public policy for exercising a legal right.

## II. IMPROPERLY RAISED ARGUMENTS

### A. Retaliation

Paddock argues that the Port terminated his employment in retaliation for the grievances he filed. In his reply brief, he contends that there "is ample evidence of retaliation on the part of the Port, which . . . leads to the claim of wrongful discharge . . . akin to a retaliatory dismissal under" the Law Against Discrimination. Appellant's Reply Br. at 21. We decline to address this argument because it is unsupported by pertinent authority.

17

No. 56466-1-II

An appellant must provide "argument in support of the issues presented for review, together with citations to legal authority and references to relevant parts of the record." RAP 10.3(a)(6). "Appellate courts need not consider arguments that are unsupported by pertinent authority, references to the record, or meaningful analysis." *Cook v. Brateng*, 158 Wn. App. 777, 794, 262 P.3d 1228 (2010).

Here, Paddock does not specifically identify a valid legal basis for his retaliation claim. Paddock points to the Law Against Discrimination, which makes it "an unfair practice for" an employer to discharge a person for opposing "any practices forbidden by" that statute or to discharge a person for filing a charge, testifying, or assisting "in any proceeding under" that statute. RCW 49.60.210(1). The law also makes it "an unfair practice for any employer . . . to discharge . . . or otherwise retaliate against an individual assisting with an office of fraud and accountability investigation[2] . . . unless the individual has willfully disregarded the truth in providing information to the office." RCW 49.60.210(3). But Paddock does not argue that the Port discharged him for opposing any practices the Law Against Discrimination forbids, nor does he contend that he assisted with an office of fraud and accountability investigation. Paddock also fails to identify a different statutory basis for his retaliation claim or cite authority establishing that retaliation is a separate tort claim. When asked at oral argument about the legal basis for his retaliation claim, Paddock mentioned the collective bargaining agreement between his former union and the Port, but the full agreement is not in our record and Paddock has not articulated a basis for a retaliation claim identified in or based on the collective bargaining agreement.

---

[2] The Department of Social and Health Services' office of fraud and accountability detects, investigates, and prosecutes "any act prohibited or declared to be unlawful in the public assistance programs" the Department administers. RCW 74.04.012(1).

18

No. 56466-1-II

Given that Paddock has provided insufficient argument to support his retaliation claim, we affirm the trial court's order dismissing it.

B.    First Amendment Violation

In his opening brief, Paddock argues that the trial court "failed to take into account" his First Amendment rights and that the Port violated those rights "by virtue of his deposition testimony." Appellant's Opening Br. at 37-38. Instead of providing further explanation, Paddock "draws the court to [his] brief in opposition to" the Port's summary judgment motion. *Id.* at 45.

The Port responds that "Paddock provides no legal authority whatsoever supporting his contention that his false testimony was entitled to" First Amendment protection. Br. of Resp't at 21 (emphasis omitted). The Port then argues that even if Paddock's speech was entitled to First Amendment protection, under the test from *Pickering v. Board. of Education.*, 391 U.S. 563, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968), the Port's interest in maintaining an efficiently functioning workplace outweighed Paddock's interest in testifying falsely.

In his reply, Paddock contends that, consistent with *Pickering*, he "is protected by the First Amendment as a public employee 'who provided truthful sworn testimony, compelled by subpoena, outside the course of his ordinary job responsibilities.'" Appellant's Reply Br. at 21-22. Paddock does not further elaborate, though, on how *Pickering* or any other First Amendment analysis applies to these facts or how he thinks *Pickering* establishes that the trial court improperly granted summary judgment in this case. And when asked at oral argument for additional explanation, Paddock did not give any.

As stated above, it is the *appellant's* responsibility to provide argument, including legal authority and citation to the record, in support of the issues they raise, and we need not consider

19

No. 56466-1-II

arguments unsupported by meaningful analysis. RAP 10.3(a)(6); *Cook*, 158 Wn. App. at 794. Paddock does not properly support his First Amendment claim in either his opening brief or his reply brief. We therefore affirm the trial court's order dismissing it.

### III. POST-TERMINATION WAGE LOSS

Paddock argues that the trial court erred in holding that "he was judicially estopped from advancing claims for" post-termination wage loss after February 13, 2017. Appellant's Opening Br. at 61. He contends that "any wage loss claim should be offset by his receipt of" Social Security Administration and Department of Labor and Industries benefits, but he should not be barred from claiming wage loss resulting from his termination from his mechanic position. *Id.* He reasons that he would have continued working for the Port as a mechanic if the Port had not discharged him, and that "he decided to undergo the surgery that limited his ability to work" only after applying for other mechanic jobs and being turned down. Appellant's Reply Br. at 25. The Port responds that Paddock is receiving benefits from the Social Security Administration "because he claims— and [the Social Security Administration] found—that he is disabled and has been unable to work at all since February 13, 2017." Br. of Resp't at 43. It argues that Paddock is therefore "judicially estopped from advancing any claims for lost earnings after February 13, 2017." *Id.*

We partially agree with the Port. Paddock gave testimony in an industrial insurance hearing that he could not work as a mechanic for the Port after his surgery, and we rely on that testimony to estop him from arguing that he is entitled to lost wages after July 19, 2017. But the social security disability determination explanation stating that Paddock became disabled in February 2017, does not trigger *judicial* estoppel.

No. 56466-1-II

'"Judicial estoppel is an equitable doctrine that precludes a party from asserting one position in a court proceeding and later seeking an advantage by taking a clearly inconsistent position.'" *Anfinson v. FedEx Ground Package Sys., Inc.*, 174 Wn.2d 851, 861, 281 P.3d 289 (2012) (internal quotation marks omitted) (quoting *Arkison v. Ethan Allen, Inc.*, 160 Wn.2d 535, 538, 160 P.3d 13 (2007)).

Paddock testified in an industrial insurance proceeding that he could not work as a mechanic for the Port after his surgery in July 2017. Paddock's testimony in the industrial insurance proceeding was under oath, and allowing him to take any inconsistent position in later litigation would lead to the impression that the later court is being misled. *See Arkison*, 160 Wn.2d at 539. Paddock cannot now or on remand contend that he would have been able to work as a mechanic for the Port after that date.

The Port asks us to conclude that judicial estoppel prevents Paddock from contradicting the social security disability determination explanation stating that Paddock became disabled in February 2017. But such determinations generally occur without hearings,[3] and the Port points to nothing in the record indicating that the Social Security Administration held a hearing on Paddock's application for disability benefits. Judicial estoppel applies when a party asserts conflicting positions in different *proceedings*. Without evidence that Paddock asserted in a proceeding that he became disabled in February 2017, we cannot conclude that *judicial* estoppel

---

[3]*Disability Evaluation under Social Security*, U.S. SOC. SEC. ADMIN. (explaining that typically, an applicant for Social Security disability benefits needs to appeal twice prior to receiving a hearing before an administrative law judge), https://www.ssa.gov/disability/professionals/bluebook/general-info.htm [https://perma.cc/2BJ8-48MC].

No. 56466-1-II

prevents him from making a claim that is inconsistent with the one he made to the Social Security Administration. The Port does not argue that any other type of estoppel applies.

Paddock relies on *Bickford v. City of Seattle*, 104 Wn. App. 809, 17 P.3d 1240 (2001), to argue that his disability benefits could be offset against an award for lost wages resulting from his termination from the Port. But *Bickford* is distinguishable because it did not address whether judicial estoppel prevents a plaintiff from claiming to be able to work in one proceeding and claiming to be disabled in another. Rather, *Bickford* addressed whether a police officer's disability pension benefits could be offset against a jury award. *Id.* at 813. And unlike Paddock, the former employee in *Bickford* received benefits under a statutory scheme that permitted police officers to receive "the benefits provided by the . . . statute and also to have a cause of action against the employer for any *excess* of damages over the amount received or receivable as benefits." *Id.* at 814.

We conclude that Paddock is judicially estopped from arguing that he would have been able to work as a mechanic for the Port after his surgery in July 19, 2017, but not earlier.

22

No. 56466-1-II

CONCLUSION

We reverse the trial court's dismissal of Paddock's wrongful discharge in violation of public policy claim and conclude that he is estopped from arguing that he would have been able to work as a mechanic for the Port after his surgery in July 2017. We otherwise affirm. We remand for further proceedings regarding the wrongful discharge in violation of public policy claim.

_Glasgow, CJ_

Glasgow, C.J.

We concur:

_Veljacic, J._

Veljacic, J.

_Che, J._

Che, J.

23